Kennedy D. Nate (14266)
  nate@mvmlegal.com
B. Scott Allen (15980)
  allen@mvmlegal.com
**McNeill | Von Maack**
175 South Main Street, Suite 1050
Salt Lake City, Utah 84111
Telephone: 801.823.6464

Attorneys for Plaintiff The Funtrepreneur Inc.
d/b/a Alwaysfits.com

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **THE FUNTREPRENEUR INC. D/B/A ALWAYSFITS.COM**, a Massachusetts corporation<br><br>Plaintiff,<br><br>v.<br><br>**DRIVE FULFILLMENT LLC**, a Utah limited liability company,<br><br>Defendant. | COMPLAINT AND JURY DEMAND<br><br><br><br><br><br>Case No.: 2:22-cv-00079-TS<br><br>Honorable Ted Stewart |

Plaintiff The Funtrepreneur Inc. d/b/a AlwaysFits.com ("AlwaysFits") for its claims against Drive Fulfillment LLC ("Drive") alleges as follows:

### PARTIES

1. Plaintiff, AlwaysFits, is a Massachusetts corporation headquartered in Beverly, Massachusetts. Since 2010, AlwaysFits has operated as an online ecommerce website selling unique gifts and collectibles in the nature of cards, books, toys and games, housewares, and clothing. It has a particular proclivity for nostalgia-themed items from the 1980s, 1990s, and 2000s, and has been widely praised for its offerings by such media outlets as The Today Show, O

The Oprah Magazine, Rolling Stone, Good Housekeeping, Redbook, and HuffPost, among numerous others.

2. Defendant, Drive, is a Utah limited liability company headquartered, upon information and belief, in American Fork, Utah. It is a third-party ecommerce logistics company specializing in distribution, warehousing, and fulfillment services.

## JURISDICTION AND VENUE

3. This is a civil action for breach of contract, negligence, and trespass to personal property.

4. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because AlwaysFits' claim exceeds $75,000.  There is also complete diversity between the parties. AlwaysFits is a Massachusetts corporation.  Drive, is a Utah limited liability company, whose members are domiciled in Utah.

5. Defendant is subject to personal jurisdiction in this judicial district because a substantial part of the events giving rise to the claims occurred in this judicial district, because, on information and belief, Defendant resides in this judicial district, and because Defendant and Plaintiff are parties to a January 19, 2021 Fulfillment Service Agreement noting that the parties consent to personal jurisdiction in the federal courts of Utah.

6. Venue is proper under 28 U.S.C. § 1391 for the same reasons outlined in paragraph 5 of this Complaint.

## GENERAL ALLEGATIONS

### The Fulfillment Service Agreement

7. On or about January 19, 2021, Plaintiff and Defendant executed a contract styled a Fulfillment Service Agreement (the "Agreement"). A true and correct copy of the Agreement is attached as Exhibit A and hereby incorporated by reference.

8. Section 2 of the Agreement sets forth various "Drive Responsibilities" agreed to by Drive. Among the listed responsibilities are as follows:

> (b) Hold and store AlwaysFits' merchandise (the "Products") in a commercially responsible manner in Drive's warehouse facilities pending fulfillment/shipment to customers.
>
> (c) Pick and pack orders and recheck orders for accuracy. Drive will be responsible for and will assume the cost of correcting all orders that are incorrectly packed or shipped, including all changes relating to re-packaging and re-shipping such orders.
>
> (d) Assemble the appropriate shipping carton(s) and/or envelope(s); insert the ordered Products(s); enclose packing list and/or Product literature, if any, tape seal, and complete shipping preparation. All items will be packaged in a commercially reasonable manner in accordance with mutually agreed upon Drive Fulfillment Customer Shipping & Receiving Standard Operating Procedures.
>
> (f) Deliver all Products to the appropriate carrier (UPS, FedEx, etc. to be jointly optimized with AlwaysFits over time based on cost and delivery experience) for shipment on the appropriate account number. **Drive will employ commercially reasonable efforts to deliver the relevant Products to the appropriate carrier by the end of the same**

**business day on which the order is shipped; otherwise, Drive will deliver the Products to the appropriate carrier on the next business day. In making this commitment, Drive expressly acknowledges and understands that AlwaysFits' business fluctuates on a seasonal basis and agrees to deliver shipped orders to the appropriate carrier by no later than the next business day notwithstanding this seasonal variation.**

(m)   Drive shall perform all the services required by this Agreement in a commercially reasonable manner. Without limiting the foregoing, all Products shall be packaged and addressed properly and shall otherwise conform to the instructions received from AlwaysFits related to receiving, repackaging, addressing, and shipping the Products. *Id.* at § 2 (emphasis added).

9.   In Section 14 of the Agreement, Drive also agreed that it would bear the responsibility for any loss or other damage to the Products that was solely and directly attributable to the negligence, willful misconduct or recklessness of Drive. "If any loss is solely and directly attributable to the negligence, willful misconduct or recklessness of Drive, Drive will reimburse AlwaysFits at the replacement cost value of the Product or damaged part thereof." *Id.* at § 14.

### The Breach

10.   Drive began fulfilling orders for AlwaysFits in February of 2021.

11.   By early May, it had fallen more than 5,000 orders behind the schedule promised by Section 2(f) of the Agreement. Those orders included time-sensitive parcels such as Mothers' Day cards and gifts—orders that AlwaysFits was forced to refund in order to avoid losing customer goodwill and detracting from its brand reputation.

12. On or about May 7, 2021, counsel for AlwaysFits wrote to Drive to ask for an explanation as well as any specific action items and concrete steps Drive intended to take on a forward-going basis to eliminate the backlog and cure any deficiencies—noting that the current levels of inventory had not only been predicted and expected, but were only about a tenth of what Drive could expect to see from AlwaysFits during the fourth quarter holiday season.

13. In response, through business-to-business discussions, Drive assured AlwaysFits that it would catch up within the next week, promising 1,000 orders a day.

14. By June, however, it had not only failed to catch up, but grown the deficit. Moreover, AlwaysFits was seeing an increase of claims for refunds from customers, particularly due to receipt of broken glass candles, shattered ornaments, and torn or punctured books.

15. On or about June 9, 2021, Ashley Judge of Always Fits emailed Alex Beck of Drive, pointing out that AlwaysFits had to hire an extra customer service representative due to the sharp uptick in tickets pertaining both to the delays, as well as the numerous errors that had cropped up with the orders that *had* been fulfilled. These errors included multiple instances of cross-brand contamination where other Drive customers were receiving AlwaysFits' orders and AlwaysFits' customers were receiving the products of other brands.

16. In this correspondence, AlwaysFits noted that it was giving Drive one last chance to turn things around in June, before starting termination procedures.

17. Despite two months of purported efforts to improve fulfillment, by the end of June, the *majority* of AlwaysFits' orders were not shipping within the timeline guaranteed by Section 2(f) of the parties' Agreement.

5

18. In fact, during May and June, AlwaysFits' "Net Promoter Score" (which measures the willingness of customers to recommend a company's products to others) dropped ten points, largely due to negative scores given by customers unhappy with the timeframe for order fulfillment and/or the damaged condition of their merchandise, once received. During that same time period, AlwaysFits was required to refund nearly *four times* as many customers as in February and March (an increase of approximately $3,400/month to approximately $12,900/month).

19. On or about July 1, 2021, counsel for AlwaysFits wrote to Drive to provide notice of breach, in accordance with Section 4 of the Agreement.

20. Section 4 of the Agreement provides that the parties agree that Drive will be in material breach of the Agreement if, within any one-month period, the fulfillment time for greater than 2% of order shipments for which inventory is on-hand is more than two business days following the date of order receipt. *Id.*

**Termination**

21. While, contractually, Drive had five business days to cure the deficit from receipt of the letter, as of July 15, 2021 (two weeks after the letter had been emailed to Drive), Drive had failed to do so—nor had it contacted AlwaysFits with any sort of explanation as to its failure.

22. AlwaysFits provided notice of termination of the Agreement in mid-July, along with instructions for the return of its inventory.

23. Section 4 of the Agreement requires Drive to "cooperate fully in any instructions" to ship or transport AlwaysFits' Products following termination of the Agreement. *Id.*

24. On July 22, 2021, counsel for AlwaysFits wrote to counsel for Drive, noting that in the intervening period, AlwaysFits had been informed of 68 new errors and had issued refunds

totaling $1,176.29. Sample images of some of the items returned to AlwaysFits as damaged due to what appears to have been inadequate packaging were also sent, and a copy attached hereto as Exhibit B.

25. Drive's counsel finally issued a substantive response to AlwaysFits' communications on August 11, 2021, claiming that Drive had packed and palletized all AlwaysFits product in its possession as of that time, and suggesting that any damage to shipped goods was due either to customer mishandling or carrier error.

26. The next day, Drive's counsel noted that Drive would be retaining the Products as security until the payment of certain remaining invoices, which had yet to be issued by Drive. Upon request, the invoices (for the months of June and July) were provided later that day.

27. The invoices did not reflect, nor did Drive agree to pay, the $19,506.61 in error log claims that AlwaysFits had made since mid-June.

28. In order to ensure the safe return of its inventory, AlwaysFits agreed to pay, under protest, the full amounts of both invoices, upon receipt of pallet weights and measures so that it could arrangement for shipment.

29. Pallet information in the form of general estimates and "a solid guess" arrived on August 17, 2021, which confirmed that, despite the representation of counsel on August 11th that all merchandise had been packed and palletized as of that date—the inventory was not yet packed as of August 17th.

30. More specific pallet information did not arrive until August 27, 2021. By that time, indeed by several days before that time, AlwaysFits had transferred the full amount of the disputed

invoices to its counsel's escrow account, with instructions to release as soon as it had received pallet information and a packing list confirming that the inventory had been packed up.

31. Drive resisted providing a packing list for AlwaysFits' merchandise, contrary to instructions, and AlwaysFits ultimately determined to proceed without it, in order to avoid further delays.

**The Returned Materials**

32. 27 pallets of material were ultimately returned to AlwaysFits in Massachusetts.

33. Many of the pallets were broken, making it difficult to transport them from the loading dock to the warehouse.

34. Virtually all boxes contained mixed stock-keeping units ("SKUs"), with products put in the box haphazardly.

35. The outside corner of each box had a plain shipping label placed on it, bearing a handwritten list of barcodes that were included in each box. SKU names and quantities were not listed.

36. By way of example, one box, designated by some sort of smiley face, contained over 100 assorted styles of greeting cards, a single pair of socks, loose coffee mugs, several books, a notepad, and unprotected and unwrapped ornaments.

37. In other instances, boxes of heavy books and mugs were placed on top of lightweight boxes of cards, oven mitts, and other soft items. This caused them to shift and tip during transit, as the lighter items were crushed under the excess weight.

38. Elsewhere, books or mugs were packed on top of fragile ornaments—often uncovered and found shattered.

39. Rows of candles were also placed at the bottom of the pallets, only to arrive as boxes of crushed glass.

40. Bags full of loose, uncounted, mixed greeting cards were located in several boxes.

41. Dozens of oven mitts were found to be covered in dust, dirt, and other stains.

42. Books and cards were unpacked with shoeprints on them, indicating that at some point the products had been stepped on. Numerous books arrived with crushed and ripped spines.

43. Several boxes of sponges were discovered to be covered in dirt and torn to pieces.

44. Likewise, decks of trivia cards were dirty and had their covers torn off.

45. Stickers were found in the bottoms of dozens of boxes, causing them to arrive dirty, scuffed, and in an unsaleable condition. Stickers were either returned loose and unorganized or wrapped so tightly with elastic bands that they were warped.

46. In all, it took AlwaysFits personnel nearly 150 hours to go through the boxes shipped by Drive to identify what was damaged or broken and consolidate the rest. Images of the condition of the shipments it received are attached hereto as Exhibit C.

**FIRST CAUSE OF ACTION**
**(Breach of Contract)**

47. Plaintiff hereby incorporates by reference the allegations contained in Paragraphs 1 through 47 above.

48. The Agreement is a valid and enforceable contract between Plaintiff, on the one hand, and Defendant, on the other hand.

49. Plaintiff performed all its obligations under the Agreement.

50. Defendant has materially breached the Agreements, as alleged above, including by failing to meet its contractual obligations for shipping deadlines, failing to cooperate with

AlwaysFits' transport instructions, and failing to reimburse Plaintiff for damage done to the Products while in Drive's care, custody, and control.

51. Defendant's breaches directly and proximately caused Plaintiff to suffer actual damages in excess of $75,000.

52. Plaintiff is entitled to interest, costs, and expenses, including reasonable attorney fees available under the Agreement.

### SECOND CAUSE OF ACTION
### (Breach of the Covenant of Good Faith and Fair Dealing)

53. Plaintiff hereby incorporates by reference the allegations contained in Paragraphs 1 through 53 above.

54. Plaintiff Defendant entered into the Agreement, which is a valid and enforceable contract between them.

55. Plaintiff performed all of his obligations under the agreement as set forth above.

56. Inherent in each contract in the state of Utah is an implied covenant of good faith and fair dealing.

57. Defendant was obligated not to destroy or injure Plaintiff's right to receive the fruits of the Agreement.

58. Defendant's conduct, including by failing to meet shipping deadlines, failing to cooperate with AlwaysFits' transport instructions, and failing to reimburse Plaintiff for damage done to the Products while in Defendant's care, custody or control, constitute material breaches of Defendant's obligation of good faith and fair dealing owed to Plaintiff under the Construction Agreements.

59. As a direct and proximate cause of the breach of implied covenant of good faith and fair dealing, Plaintiff has been damaged in an amount to be proven at trial, but in amount of not less than $75,000, and, to the extent applicable, interest, costs, and attorney fees.

## THIRD CAUSE OF ACTION
### (Negligence)

60. Plaintiff hereby incorporates by reference the allegations contained in Paragraphs 1 through 53 above.

61. Defendant was under a duty to exercise reasonable care in its handling of the Products while in Defendant's custody.

62. Defendant failed to exercise reasonable care in the storage, handling, picking, packing, and/or packaging of the Products.

63. Plaintiff has been harmed by Defendant's breach of duty, including, but not limited to: (a) unreimbursed costs for errors, losses, and damages incurred in June and July, as well as (b) uncompensated damage to the Products returned to Plaintiff following termination of the Agreement, which has rendered such Products unsaleable.

## FOURTH CAUSE OF ACTION
### (Trespass to Personal Property)

64. Plaintiff hereby incorporates by reference the allegations contained in Paragraphs 1 through 57 above.

65. AlwaysFits had ownership of the Products at the time that Drive picked and packed said Products for return to AlwaysFits.

66. While Drive was authorized to pick and pack the Products in its possession for return to AlwaysFits, Drive handled the Products in a manner exceeding the consent given, and not reasonably necessary to accomplish the purpose for which authorization was given.

67. In particular, Drive intentionally damaged the Products prior to shipment, and/or intentionally mishandled the Products during preparation for shipment (such as by packing without any packaging material which would ensure safe transport of these items).

68. In doing so, Drive intended to damage and deprive AlwaysFits of the usage of the Products and/or was aware that damage was substantially certain to occur (as it did).

69. Drive had no right or justification to abuse the privilege it had been afforded, by handling the Products in a manner exceeding the consent given, and in a manner not reasonably necessary to accomplish the purpose for which authorization was given.

70. Drive is thereby liable for the resulting harm caused by Drive's abusive acts in intentionally interfering with AlwaysFits' ownership rights to the Products.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests judgment against Defendant on all claims and defenses asserted in this action, in an amount to be proven at or before trial, plus its attorneys' fees, costs, and interest, together with such other and further relief as shall be just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues herein so triable.

DATED this 8th day of February, 2022.

**McNeill | Von Maack**

_____
Kennedy D. Nate
B. Scott Allen
*Attorneys for Plaintiff The Funtrepreneur Inc. d/b/a Alwaysfits.com*